FILED
March 09, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002470799

Matthew R. Eason, Esq. (SBN 160148)
Kyle K. Tambornini, Esq. (SBN 160538)
EASON & TAMBORNINI
1819 K Street, Suite 200
Sacramento, CA 95814
(916) 438-1819
(916) 438-1820

Proposed Attorneys for Debtor-in-Possession
Sky King, Inc.

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>Sky King, Inc.<br><br>　　　　Debtor-in-Possession | Case No. 10-25657<br><br>PRELIMINARY HEARING<br>Date: March 9, 2010<br>Time: 1:30 p.m.<br>Dept: C<br>Ctrm: 35<br>DCN: MRE-002 |

**DEBTOR'S MOTION FOR APPROVAL OF USE OF
CASH COLLATERAL ON AN INTERIM AND FINAL BASIS**

TO: HONORABLE JUDGE CHRISTOPHER M. KLEIN UNITED STATES BANKRUPTCY JUDGE IN THE ABOVE-CAPTIONED CHAPTER 11 CASE: reservoir

Sky King, Inc., as debtor and debtor in possession (the "Debtor") in the above-captioned case, hereby moves (this "Motion") the above-captioned Court for entry of an order, substantially in the form attached as Exhibit "A" to the declaration of Gregg Lukenbill (the "Lukenbill Declaration") filed concurrently with this Motion (the "Proposed Interim Order"), pursuant to the provisions of Section 363 of the Bankruptcy Code and Rule 4001(b) of the Bankruptcy Rules, for the approval of the Debtor's use of cash collateral, on both an interim and final basis, to pay expenses necessary to maintain the Debtor's ongoing post-petition airline operations and

1

administer the Debtor's chapter 11 case.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are Sections 105(a), 361, 363, 541, 1107(a), and 1108 of the Bankruptcy Code..

## BACKGROUND

1. This case was commenced on March 9, 2010 by the filing of a Voluntary Chapter 11 Petition.

2. Sky King, Inc. was founded in July of 1990, concurrent with the purchase of a BAC 1-11 aircraft. At that time, its founder, Gregg Lukenbill, was the managing partner of the Sacramento Kings basketball team, and was serving in his 8th year on the Board of Governors of the National Basketball Association (NBA). Rapidly escalating commercial airline costs for the Kings over the preceding seven years, coupled with inconvenient and unreliable service, led Sky King, Inc. to acquire a BAC 1-11 aircraft to lease to the team and to other clientele. In May 1991, Sky King obtained a Part 125 operating certificate. Gregg Lukenbill subsequently sold my interest in the Sacramento Kings in 1992, retaining the sole ownership interest in the aircraft and operating certificate. Over the next six years, Sky King continued to transport the Kings, but also contracted with entertainment groups, major corporate executives, and other sports entities.

3. On September 1, 1998, Sky King opened its heavy maintenance facility in Atwater, California for the purpose of performing major maintenance inspections on Sky King aircraft. Also in late 1998 Sky King acquired its first 737-200 aircraft, which was put into service in February 1999, transporting NBA basketball teams and NHL hockey teams. A second 737-200

was acquired in November 1999, bringing the total aircraft fleet to three. The BAC 1-11 aircraft was sold in September 2000, with the objective of replacing it with a third 737 aircraft.

4. Continued demand for services led Sky King to acquire three additional 737-200 aircraft in 2001. By the fall of 2001, Sky King was transporting 10 sports teams on long-term contracts, with demand from other entities continuing to be high.

5. In October of 2002, Sky King obtained a Part 121 operating certificate. Since that time, Sky King has continued to develop and expand its business foundation. Particularly noteworthy is the addition in 2006 of service out of several east coast airports, with routes to Mexico, the Caribbean, and other east coast cities.

6. In 2004, Sky King, Inc. was a major carrier for various NHL teams. Unfortunately negotiations between the NHL and the NHL Players Association broke down and resulted in a lockout that lasted throughout the entire 2004-2005 season. Because the length of the lockout was unpredictable, and because Sky King, Inc., was under contract to provide transportation to the NHL once the lockout ended, Sky King Inc.'s fleet of planes sat mostly grounded during that period of time. Sky King, Inc., was faced with enormous overhead and operating expenses, and little revenue during that period of time.

7. Sky King, Inc. was strapped with a tremendous amount of debt as a result of the strike, and did everything it could to keep its business afloat. Around 2007-2008, Sky King Inc., began seeing a significant turnaround in business operations, and then was faced with the current economic downturn.

8. With the change in economy, the need for charter flights diminished, and competition within that field grew significantly. While that was a significant setback, Sky King, Inc. as a relatively small airline carrier was able to shift its focus, and begin operations in Atlantic City, and in emerging markets including Cuba.

3

9. Sky King, Inc. has seen remarkable improvement in those areas, and seen dramatic increases in monthly revenues. Unfortunately, past debts incurred as a result of the previous economic struggles have continued to create financial havoc.

10. Sky King, Inc. has tried desperately to manage the debt such as to allow it to make payments in a reasonable manner, and has been able to do so for many years. Unfortunately Mercury Air Group, Inc., a creditor for old fuel purposes has not been as accommodating, and sought the appointment of a receiver.

11. On March 9, 2010 (the "Petition Date"), the Debtor commenced its reorganization case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

12. The Debtor is a California corporation. The Debtor is not the direct or indirect parent of any non-debtor affiliates.

13. The Debtor currently operates a fleet of nine 737 aircrafts both domestically and internationally. Its' principal operations based is in Sacramento, California, and its principal maintenance facility is in Atwater, California.

14. The Debtor commenced this chapter 11 case after a thorough review of all of its refinancing and restructuring alternatives and only after it became clear that an out-of-court alternative would not be able to be completed in sufficient time to address the appointment of a receiver by a general unsecured creditor.

15. Accordingly, to preserve the assets of its estate for the benefit of all of its stakeholders, the Debtor commenced this case. The Debtor believes that the initiation of the chapter 11 case will allow it access to the necessary capital to implement its business plan and complete the refinancing or liquidation of its assets.

16. The Debtor has not completed its schedules and Statement of Financial Affairs, but has

taken substantial steps to compete them.

17. The Debtor has approximately 130 employees. Generally speaking, 60 of those employees are charged with operation of the planes and handling of passengers, 54 of those employees are involved with maintenance of the aircraft, and 16 of those employees handle administrative tasks. Without the employees, the business could not operate, passengers would be stranded, and flights cancelled.

**SECURITY INTERESTS**

18. The Debtor is not aware of any agreements in which Sky King, Inc., pledged as collateral the cash, accounts receivables, or receipts of the business operations.

19. The Debtor believes it only has six voluntary secured loans: A first, second, and third deed of trust on the business offices through Holt Financial (first), Holt Financial (second), and AE Wolffe dba Job-Air (third) respectively; as well as a lien for approximately $1,700,000 secured by one of the Boeing 737's in the Debtor's fleet; and an additional lien for approximately $900,000 on a different Boeing 737. The debtor also operates seven other Boeing 737's pursuant to various lease agreements.

20. The debtor previously issued a security agreement in airplane parts, which resulted in a UCC1 filed with the California Secretary of State by Mercury Air Group, Inc. on November 9, 2006. However, debtor anticipates that probably all but 25% of those parts have been utilized. Furthermore, the creditor subsequently sued and received a judgment which debtor contends eliminated the security agreement. The UCC1 is attached to the Declaration of Gregg Lukenbill as Exhibit "C"

21. The business offices do not generate rents, so the debtor does not believe that the assignment of rents provisions in the deed of trust(s) on the real property are applicable to this pending bankruptcy, or to the use of cash or accounts receivables.

22. The debtor has reviewed the liens on the two Boeing 737's, and they do not appear to have provisions which would create liens on cash or accounts receivables generated by their use.

23. The Internal Revenue Service however has filed at least twelve Notice of Federal Tax Liens with the California Secretary of State between August 7, 2003 and January 29, 2010. Copies of those liens are attached to the Declaration of Gregg Lukenbill as Exhibit "D."

24. The State of California, Employment Development Department, has filed at least five Notice of State Tax Liens with the California Secretary of State between October 23, 2006 and February 3, 2010. Copies of those liens are attached hereto as Exhibit "E"

25. A vendor creditor, W.W. Grainger, Inc., filed a UCC J1 with the California Secretary of State on March 13, 2009 for the sum of $23,729.16. The current amount due to W.W. Grainger is in dispute, but is approximately $4,000.

26. Because the debtor operates across many different jurisdictions, national and international, the Debtor has not had a reasonable opportunity to review with counsel whether or not the filings with the California Secretary of State has created security interests in the cash and/or accounts receivables outside the State of California, and if so to what extent..

27. In addition Mercury Air Group, Inc., has a judgment in the approximate amount of $800,000 and has taken various steps to collect upon the judgment. Because the debtor operates across many different jurisdictions, national and international, the Debtor has not had a reasonable opportunity to review with counsel the action taken by Mercury Air Group, Inc. to see whether any of those collection actions have created security interests in the cash and/or accounts receivables of the debtor.

28. The Debtor proposes to use cash collateral in which the Internal Revenue Service, the State of California, W. W. Grainger, Inc., and/or Mercury Air Group, Inc., may potentially

assert interests, namely the cash proceeds and/or accounts receivables to continue to operate the company in its regular and ordinary course of business affairs within the budge attached hereto as Exhibit "A" (the `Budget").

29. Payment of those expenses is critical to the preservation and value of the estate's on-going business. Without the payment of those expenses, flights will be cancelled, passengers stranded, business opportunities and relationships lost, and damages incurred.

30. The Debtor seeks only to maintain the status quo while formulating a plan of reorganization.

## RELIEF REQUESTED

Based upon the foregoing, the Debtor respectfully requests that the Court enter order in substantially the same form and the same terms as attached as Exhibit "B."

## DISCUSSION

The Debtor respectfully submits that the use of collateral as proposed herein is proper and supported by applicable law, as follows:

**A. TO THE EXTENT THAT THE CLAIMS ARE SECURED, EACH ARE ADEQUATELY PROTECTED.**

Section 363(c) of the Bankruptcy Code provides that a debtor may use cash collateral if (i) the entity with an interest in the cash collateral consents, or (ii) the Court authorizes such use. 11 U.S.C. § 363(c). Furthermore, Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used ... by the [debtor in possession], the court ... shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e). "The concept of `adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection.

Under Section 361, adequate protection may be provided by cash payments or additional or replacement liens. *In re Mullen*, 172 B.R. 473, 476 (Bankr. Mass. 1989) (disagreed with on other grounds). Here, replacement liens will provide the required adequate protection: As long as the Debtor's cash flow is positive, it is generating more cash than it is expending, and the secured claimants' replacement liens will more than cover the amounts expended.

In addition, the very act of preserving the value of the business operations will continue to generate replacement revenues, as well as preserve the integrity of the estate, thus in and of itself will provide protection.

For these reasons, the Debtor submits that the secured claimants' interests will be adequately protected under the provisions of Sections 363(c) and (e) of the Bankruptcy Code, and that the proposed use of its cash collateral should therefore be authorized.

### B. AUTHORIZING USE CASH COLLATERAL IS NECESSARY AND IN THE ESTATE'S BEST INTERESTS.

It is well established that a bankruptcy court, where possible, should be flexible in applying an adequate protection standard to enable debtors to maximize value, "[i]n order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard." *In re O'Connor*, 808 F.2d 1393, 1397-98 (10th Cir. 1987). For example, in *In re Stein* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral, although the secured party was undersecured, because the court found that the use of cash collateral was necessary to the debtor's continued operation and the creditor's "secured position can only be enhanced by continued operation of debtor's business. Id.

The focus of the adequate protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the value of its collateral during the reorganization process. *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

As noted above, the Debtor requires immediate access to cash collateral to continue normal business operations. Facilitating the continued operations of the Debtor's will allow the Debtor to maximize assets for the ultimate benefit of the Debtor's secured and unsecured creditors. For these reasons, the Debtor submits that authorizing the use of cash collateral is necessary and in the best interest of the Debtor's estate and its creditors.

Without use of the cash collateral, the Debtor would have no ability to operate its business, because it would be unable to pay its employees, vendors and others. As a result, without the use of cash collateral, the Debtor would be unable to maintain the business to the detriment of all other creditors.

Courts have routinely held that adequate protection may be demonstrated by a showing that the going concern value of the debtors, or the value of the lender's collateral, is preserved by the debtor's continuing operations and use of cash collateral. See, e.g., *In re JKJ Chevrolet, Inc.*, 117 F.3d 1413, 1413 (4th Cir. 1997) (allowing use of cash collateral to operate automobile dealership as long as continued operations maintained the value of the business); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1087 (4th Cir. 1986) (allowing use of cash collateral to operate ski resorts where trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56- 57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on collateral property); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use

cash collateral to operate and maintain office building, thereby protecting secured lender's collateral).

Similarly here, the Debtor intends to use the cash collateral to operate the business. The proposed cash expenditures are necessary to preserve and maintain the value of the business and the interests of creditors.

Therefore, use of cash collateral in the manner proposed is absolutely necessary to preserve the overall value of the Debtor's ongoing enterprise and enhance the chances of a successful outcome of this case. If the Debtor is precluded from making expenditures necessary to maintain its assets, all creditors - secured and unsecured - will be harmed. This, in and of itself, justifies the relief sought herein. See, e.g., *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized," citing *In re Grant Broad of Philadelphia, Inc.*, 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1987), affirmed, 75 B.R. 819 (RD. Pa. 1987)).

Accordingly, use of cash collateral as proposed herein is both necessary and in the best interests of all creditors, including the potential lien holders.

### C. INTERIM APPROVAL IS APPROPRIATE.

Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary hearing on such motion, on an expedited basis, and to authorize the use of that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the Debtor's estate. As stated herein, the Debtor also respectfully requests that the relief sought in the Motion be granted initially on an interim basis, through April 2010, so that there will be no undue interruption of the business operations for lack

of funding.. Under the circumstances of this case, particularly given the adequate protection measures proposed herein, the Debtor respectfully submits that such interim relief is fully justified.

## CONCLUSION

WHEREFORE, based upon all of the foregoing, the Debtor respectfully requests that this Court enter an order, substantially in the form of the Interim Order, granting the relief herein requested and such other and further relief as the Court deems just and proper

Date: March 9, 2010                  Eason & Tambornini

Matthew R. Eason
Proposed Attorney for Sky King, Inc. as Debtor and Debtor in Possession